IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MELANIE HAWS,<br><br>               Plaintiff,<br><br>v.<br><br>MICHAEL NORMAN,<br><br>               Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 19)**<br><br>Case No. 2:15-cv-00422-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Melanie Haws moves the Court[1] for summary judgment on her failure to accommodate her disability and retaliation claims against Defendant Michael Norman. (Pl.'s Mot. for Summ. J. ("Mot."), ECF No. 19.) Ms. Haws alleges Mr. Norman denied her requests for an assistance animal and retaliated against her in violation of the Federal Fair Housing Act and the Utah Fair Housing Act. (Compl., ECF No. 2.) After considering the parties' briefing and hearing oral argument, the Court DENIES summary judgment on Ms. Haws's failure to accommodate and retaliation claims.

## I. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 9.)

56(a). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013) (quoting E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000)). On a motion for summary judgment, the Court reviews the facts in a light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor. Jones v. Norton, 809 F.3d 564, 573 (10th Cir. 2015).

## II. FACTUAL BACKGROUND

Taking the facts in a light most favorable to Mr. Norman, the following facts provide the basis for decision. Mr. Norman owns a triplex in Logan, Utah. (Pl.'s Mot. for Summ. J. ("Mot.") ¶ 1, ECF No. 19; Corrected Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Opp'n") 4, ECF No. 21.) In spring 2013, Ms. Haws rented one room in a triplex unit from Mr. Norman. (Mot. ¶ 3, ECF No. 19; Opp'n 4, ECF No. 21.) The triplex unit includes four bedrooms with their own bathrooms, a common kitchen area, common living room, and common hallway. (Reply Mem. to Def.'s Opp'n to Mot. for Summ. J. ("Reply") ¶ 60, ECF No. 22; Payne Dep. 8:8-13, Ex. 1, ECF No. 21-1; Arrowood Dep. 8:2-10, Ex. 2, ECF No. 21-1.) Ms. Haws lived with three roommates in the triplex unit. (Id. ¶ 61.) Ms. Haws's original lease began August 15, 2013 and ran through May 10, 2014. (Reply ¶ 52, ECF No. 22.) The lease agreement included a provision about pets:

> Residents may not keep a pet of any kind in the building or on the Owner's property. For any violation of this provision in addition to the Owner's other remedies, Owner may charge and collect the sum of $50.00 per day, per violation. All costs of cleaning, de-fleaing, or other damage or loss suffered on account of a violation of this section shall be promptly paid to

> Owner by Resident.  Violation of this provision will allow Owner to
> commence eviction on the bases of nuisance without any further notice.

(1st Lease Agreement, Ex. 11 at 2, ECF No. 21-1.)

In June or July of 2013, Ms. Haws asked Mr. Norman whether she could have a dog live with her in the apartment.  (Opp'n ¶ 10, ECF No. 21.)  Ms. Haws does not recall if she specifically mentioned that the dog related to her disability or if she made a specific accommodation request.  (Haws Dep. at 31:7-12, Ex. E, ECF No. 19-1.)  Mr. Norman does not recall Ms. Haws making a specific accommodation request or offering to provide a prescription letter or other medical documentation at that time.  (Norman Dep. at 11:1-25, Ex. 8, ECF No. 21-1; Def.'s Resps. to Pl.'s 1st Set of Interrogs., Reqs. for Admiss., & Reqs. for Produc. of Docs., ("Def.'s 1st Disc. Resps.") at 5-6, Ex. 9, ECF No. 21-1.)

Ms. Haws renewed her lease agreement with Mr. Norman for the following August 15, 2014 to May 10, 2015.  (Reply ¶ 53, ECF No. 22.)  The renewed lease agreement included the same pets provision.  (2d Lease Agreement at 2, Ex. 12, ECF No. 21-1.)  In January of 2015, Ms. Haws's bishop, Daniel Everton, called Mr. Norman on her behalf to ask whether Ms. Haws could live with a dog.[2]  (Opp'n ¶ 23, ECF No.

---

[2] Mr. Norman uses the term "service animal" and takes issue with the term "assistance animal."  (Opp'n ¶¶ 23, 25, ECF No. 21.)  While the Americans with Disabilities Act (ADA) limits the definition of "service animal" to include only dogs and defines "service animal" to exclude emotional support animals, this restriction does not limit housing providers' obligations to provide reasonable accommodations for assistance animals under the Federal Fair Housing Act.  See 28 C.F.R. Pt. 35, App'x A re: 35.104 Definition of Service Animal (contrasting the ADA with the Federal Fair Housing Act regarding covered animals); HUD Office of Fair Housing & Equal Opportunity, FHEO Notice FHEO-2013-01, Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs (Apr. 25, 2013), available at https://portal.hud.gov/hudportal/documents/huddoc?id=servanimals_ntcfheo2013-

21.)  Specifically, Mr. Everton stated in his affidavit that he told Mr. Norman about Ms. Haws's doctor's suggestion and "asked if [Mr. Norman] would allow her to have a dog." (Norman Aff. ¶ 5, Ex. H, ECF No. 19-1.)  Ms. Haws gave a letter to Mr. Everton from her therapist to give Mr. Norman, but she does not know if Mr. Everton ever gave that letter to Mr. Norman.  (Letter from Booton to Norman, Jan. 29, 2016, Ex. 6, ECF No. 21-1; Haws Dep. 49:7-50:19, Ex. E, ECF No. 19-1.)  Mr. Norman does not recall the conversation and did not understand that Mr. Everton sought an accommodation for Ms. Haws's disability.  (Norman Dep. at 13:1-14:22, Ex. 8, ECF No. 21-1; Def.'s 1st Disc. Resps. at 6, Ex. 9, ECF No. 21-1.)  Mr. Norman did not seek follow up information and denied the request.  (Norman Dep. at 14:10-22, Ex. 8, ECF No. 21-1.)

In March of 2015, Ms. Haws obtained a dog that lived with her in the apartment. (Opp'n ¶ 25, ECF No. 21.)  In April 2015, Mr. Norman discovered Ms. Haws had a dog after one of Ms. Haws's roommates called Mr. Norman to complain.  (Opp'n ¶ 26, ECF No. 21; Reply ¶ 65, ECF No. 22.)  When Mr. Norman asked Ms. Haws about the dog, Ms. Haws gave Mr. Norman an accommodation request letter and documentation from her psychologist.  (Opp'n ¶ 14, ECF No. 21.)  In her accommodation letter, Ms. Haws informed Mr. Norman that she needed an emotional support animal in her residence to "aid in the alleviation of some of the symptoms of [her] disabilities" as recommended by her therapist.  (Letter from Haws to Norman, Ex. G, ECF No. 19–1.)  The April 20, 2015 letter from Ms. Haws's psychologist stated that Ms. Haws "has been diagnosed with 309.81, Posttraumatic Stress Disorder and 296.30, Major Depressive Disorder, Recurrent Episode."  (Letter from Melvin & Kleiner, Apr. 20, 2015, Ex. A, ECF No. 19–

01.pdf, last visited Sept. 20, 2017.  In this case, Ms. Haws sought an accommodation to have an assistance animal in her apartment.

1.)  The letter states, "[t]the animal is a necessary accommodation for her functioning and to increase her subjective enjoyment of her residence."  (Id.)

Ms. Haws was diagnosed with depression, anxiety, and post-traumatic stress disorder in 2014 and experienced these conditions prior to her diagnosis.  (Opp'n ¶ 8, ECF No. 21.)  Ms. Haws's conditions did not appear to her roommates to affect her daily functioning, and they did not know she had a disability.  (Opp'n ¶ 9, ECF No. 21.)  Ms. Haws experienced emotional ups and downs, sought counseling, and received prescriptions for anxiety, depression, and insomnia.  (Clinic Notes, Ex. 3, ECF No. 21-1.)  Ms. Haws's mental condition made studying difficult, and she had trouble focusing; it interfered with her ability to sleep, eat, and develop interpersonal relationships.  (Clinic Notes, Ex. 3, ECF No. 21-1; Univ. of Utah Health Care Records, Ex. 4, ECF No. 21-1; Letter from Melvin & Kleiner, Apr. 20, 2015, Ex. A, ECF No. 19-1; Assessment by Johnson, Ex. C, ECF No. 19-1; Clinic Notes, Ex. D, ECF No. 19-1.)  At times, Ms. Haws contemplated suicide.  (Assessment by Johnson, Ex. C, ECF No. 19-1; Clinic Notes, Ex. D, ECF No. 19-1.)

When Ms. Haws provided Mr. Norman with the accommodation letters, Mr. Norman told Ms. Haws she could not have a dog at the apartment because her roommates had complained about it.  (Norman Dep. 18:2 – 19:17, Ex. F, ECF No. 19-1.)  Specifically, Ms. Haws failed to confine the dog to her room, and it urinated in the common rooms as well as in the roommates' rooms.  (Payne Dep. 16:1-17:13, 19:1-20, Ex. 1, ECF No. 21-1; Arrowood Dep. 16:10-18:25, Ex. 2, ECF No. 21-1.)  Mr. Norman told Ms. Haws he would charge her fifty dollars a day for having the dog prior to requesting accommodation in April 2015.  (Opp'n ¶ 35, ECF No. 21.)  Mr. Norman also

called Ms. Haws's uncle, Brad Bachman, and attempted to enlist Mr. Bachman's help in resolving the dispute with Ms. Haws over her dog. (Opp'n ¶ 37, ECF No. 21.) However, Ms. Haws continued to live in the apartment with her dog through the end of her lease on May 10, 2015. (Haws Dep. 74:5-75:7, Ex. 5, ECF No. 21-1.) On April 29, 2015, Mr. Norman billed Ms. Haws $1,050 for keeping a dog in the apartment. (Opp'n ¶ 36, ECF No. 21.) Mr. Norman billed Ms. Haws for fifty dollars per day for each day Ms. Haws had her dog prior to his receiving the request for accommodation. (Def.'s 1st Disc. Resps., Ex. 9, ECF No. 21-1.)

On May 15, 2015, Mr. Norman initiated a small claims action against Ms. Haws in the Logan City Municipal Justice Court seeking to recover $1,400 plus fees for "keeping a dog in her apartment." (Opp'n ¶ 38, ECF No. 21.) Mr. Norman took these actions because he wanted to avoid obtaining "a reputation for just letting everything slide." (Opp'n ¶ 49, ECF No. 21.)

## III.  DISCUSSION

### A.    Application to Shared Living Units

As a threshold issue, Mr. Norman argues the Federal Fair Housing Act and Utah Fair Housing Act (collectively "the Fair Housing Acts") do not apply to shared living units, precluding summary judgment in Ms. Haws's favor. (Opp'n 31, ECF No. 21.) As explained above, Ms. Haws rented one of the four rooms with a communal living space. She did not select her roommates. The Fair Housing Acts prohibit discrimination in the rental of a "dwelling" because of a person's disability.[3] 42 U.S.C. § 3604(f)(2); Utah

---

[3] The Federal Fair Housing Act uses the word "handicap." 42 U.S.C. § 3602(h). The Utah Fair Housing Act uses the word "disability." Utah Code Ann. § 57-21-2(10). Any differences in the definitions do not arise in this case. For purposes of federal law, the

Code Ann. § 57-21-5(1)(b).  The Acts define a "dwelling" as a building or any portion of a building "intended for occupancy as, a residence by one or more families."  42 U.S.C. § 3602(b); Utah Code Ann. § 57-21-2(14).

Mr. Norman cites Fair Housing Council v. Roommate.com, LLC, 666 F.3d 1216 (9th Cir. 2012), for the proposition that the Fair Housing Acts do not apply to shared living units.  In that case, the defendant Roommate.com, LLC ("Roommate") operated a website that matched a person seeking to find a roommate with a person looking to rent an available room.  Id. 666 F.3d at 1218.  When users signed up with Roommate, they created a profile and answered a series of questions including questions about their sex, sexual orientation, and familial status.  Id.  The Fair Housing Councils of San Fernando Valley and San Diego sued Roommate, claiming the required questions about a person's sex, sexual orientation, and familial status violated the Federal Fair Housing Act.  Id.  The court held that Roommate's questions did not violate the Federal Fair Housing Act because the Act permits potential roommates to discriminate in selecting a roommate in a shared living unit.  Id. at 1222.  The Ninth Circuit reached this conclusion by interpreting the Act narrowly to avoid reaching the constitutional implications raised by the intrusion into the privacy of a person's home and the choice of with whom one lives.  Id. at 1221-22.  The court also explained that in enacting the Federal Fair Housing Act:

> Congress wanted to address the problem of landlords discriminating in the sale and rental of housing, which deprived protected classes of housing opportunities.  But a business transaction between a tenant and landlord is quite different from an arrangement between two people sharing the

---

two words carry the same meaning.  Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  The Court will use the terms "disability" and "disabled" in accordance with the current vernacular.

same living space. We seriously doubt Congress meant the FHA to apply to the latter.

Id. at 1220.

Unlike Roomate.com, this case does not involve alleged discrimination in roommate selection. In fact, Ms. Haws did not even choose her roommates—her landlord did. Instead, this case involves alleged discrimination by a landlord. As noted above, the Roommate.com court recognized that the Federal Fair Housing Act specifically aims to govern the conduct of landlords in housing rentals. To hold that an individual protected by the Fair Housing Acts loses those protections because she lives in a shared living unit would exempt landlords who rent shared living units from the Fair Housing Act. Nothing in the Fair Housing Acts demonstrates an intent to exempt those landlords, and Roommate.com did not address landlords but rather roommates. Therefore, the Court declines to extend Roommate.com's holding to relieve landlords of their Fair Housing Acts obligations.

## B.    Failure to Accommodate

Discrimination under the Fair Housing Acts includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); Utah Code Ann. § 57-21-5(4)(b). To prevail on a failure to accommodate claim under the Fair Housing Acts, Ms. Haws must prove: (1) she suffers from a disability as defined by the Fair Housing Acts; (2) Mr. Norman knew or reasonably should have known of Ms. Haws's disability; (3) Ms. Haws needs accommodation to have an equal opportunity to use and enjoy her dwelling; (4) the accommodation is reasonable; and (5) Mr. Norman refused to make such

accommodation. <u>Arnal v. Aspenview Condo. Ass'n</u>, 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016) (citing <u>Dubois v. Ass'n of Apartment Owners</u>, 453 F.3d 1175, 1179 (9th Cir. 2006)).

### 1.   **Whether Ms. Haws Qualifies as Disabled Under the Fair Housing Acts**

Ms. Haws argues she qualifies as disabled under the Fair Housing Acts because her depression, anxiety, and post-traumatic stress syndrome substantially limit her major life activities of "eating, self-care, receiving an education, sleeping, and interacting socially, and have caused her to contemplate suicide on several occasions." (Mot. 3, ECF No. 19.) Mr. Norman disputes that Ms. Haws's conditions substantially limit her major life activities, citing to Ms. Haws's roommate's deposition testimony "that they never saw Plaintiff struggle in any way and that nothing seemed unusually difficult for Plaintiff." (Opp'n 5, ECF No. 21.) Further, Mr. Norman argues Ms. Haws's "medical records demonstrate that whatever effects Plaintiff experienced from her medical conditions were sporadic at best." (<u>Id.</u> at 5-6.) The Court finds a disputed issue of material fact exists as to whether Ms. Haws qualifies as disabled under the Fair Housing Acts.

Under the Fair Housing Acts, a disability includes "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1); Utah Code Ann. § 57-21-2 (10); <u>Rodriguez v. Village Green Realty, Inc.</u>, 788 F.3d 31, 42–43 (2d Cir. 2015). A "physical or mental impairment" encompasses mental or psychological disorders including an "emotional or mental illness." 24 C.F.R. § 100.201(a)(2). "Major life activities" include "caring for one's self" <u>and</u> "learning." 24 C.F.R. § 100.201(b).

The Tenth Circuit has not expounded on the disability portion of a failure to accommodate claim under the Fair Housing Acts. Because of the similar subject matter and similar definitions in the ADA and the Fair Housing Acts, Bragdon, 524 U.S. at 631, the Court will consider the Tenth Circuit's decisions under the ADA where it has not weighed in on the Federal Fair Housing Act. In the ADA context, the Tenth Circuit breaks the disability inquiry into three parts: 1) whether the plaintiff has an impairment, 2) "[w]hether the conduct affected is a major life activity," and 3) "whether the impairment substantially limits the major life activity." Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003). The first two prongs constitute questions of law for the court to decide, but the third presents a factual question for the jury. Id. While Ms. Haws certainly presents enough evidence showing her disability to "survive" summary judgment, Mr. Norman's contests to this evidence prevent Ms. Haws from prevailing on summary judgment. As the Tenth Circuit has noted,

> Determining both how well "the average person in the general population" performs any given major life activity and whether the plaintiff has proven he is "unable to perform" or is "significantly restricted" in performing a major life activity is a factual question for the jury.

Id. (quoting Briston v. Bd. of Cty. Comm'rs., 281 F.3d 1148, 1158 (10th Cir.), rev'd in part on other grounds, 312 F.3d 1213 (10th Cir. 2002) (en banc)).

Other circuits applying the Federal Fair Housing Act have reached similar conclusions. The "substantially limited" inquiry is fact intensive and must be made on a case-by-case basis. See Rodriguez, 788 F.3d at 43 ("requir[ing] '[a]n individualized assessment' to determine the existence of a disability") (quoting Toyota Motor Mfg. v. Williams, 534 U.S. 184, 199 (2002)).

"The first question is whether the [nonmovant] provided sufficient evidence to create a genuine dispute that the [plaintiff] suffers from an impairment." Rodriguez, 788 F.3d at 42. Mr. Norman does not dispute that Ms. Haws has the impairments she claims. (Opp'n ¶¶ 7-8, ECF No. 21.) The Court must then determine whether the activities affected reflect major life activities. Doebele, 342 F.3d at 1129. Ms. Haws has put forth evidence of the effect of her impairments on her life in the medical records and request for accommodation letter, among other evidence. (Letter from Melvin & Kleiner, Apr. 20, 2015, Ex. A, ECF No. 19-1; Assessment by Johnson Ex. C, ECF No. 19-1; Clinic Notes, Ex. D, ECF No. 19-1.) Mr. Norman does not contest that caring for oneself, learning, sleeping, and interacting are major life activities. (Opp'n ¶ 27, ECF No. 21.) Therefore, the Court finds Ms. Haws meets the first two prongs of the test.

Lastly, Ms. Haws must show that her impairments substantially limited her in these activities to the degree that no reasonable jury could conclude otherwise. While Mr. Norman does not submit any contrary medical opinion testimony, he submits the testimony of the other people sharing common living areas with Ms. Haws who testify that she did not appear to have difficulties with major life activities.[4] Mr. Norman also argues that Ms. Haws's medical records show she only suffered from these problems intermittently, thus they did not substantially limit a major life activity. (Opp'n ¶ 9, ECF No. 21.) The Court finds that the extent of the effect constitutes a disputed issue of fact for determination by the jury. See accord Bhogaita v. Altamonte Heights Condo. Ass'n, 765 F.3d 1277, 1287-88 (11th Cir. 2014) (upholding jury verdict finding plaintiff disabled under Federal Fair Housing Act).

---

[4] The roommates cannot testify to the presence or absence or an impairment, but they can testify to what they observed.

## 2.    Mr. Norman Knew of Ms. Haws's Disability in April 2015

To satisfy the second element of the failure to accommodate claim, Mr. Norman must have known or be reasonably expected to have known about Ms. Haws's handicap.  Dubois, 453 F.3d at 1179.

> Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability.  She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

Joint Statement of HUD & DOJ, Reasonable Accommodations under the Fair Hous. Act, Question 12, May 17, 2004, https://hud.gov/offices/fheo/library/huddojstatement.pdf  last visited Sept. 18, 2017.  "An individual making a reasonable accommodation request does not need to mention the Act or use the words 'reasonable accommodation.'"  Id.

Ms. Haws claims she put Mr. Norman on notice of her disability on three separate occasions:  in June or July of 2013 when Ms. Haws asked whether she could bring a dog to live with her, in January of 2015 when Ms. Haws's bishop called Mr. Norman, and in April of 2015 when Ms. Haws provided Mr. Norman with a letter from her and her psychologist.  As stated above, with respect to the 2013 conversation between Ms. Haws and Mr. Norman, Ms. Haws does not recall if she made a specific request for accommodation, and Mr. Norman does not recall such a request either.  In addition, with respect to the January 2015 conversation, Mr. Everton's affidavit does not state that he made a request for accommodation or provided the therapist's letter—only that he told Mr. Norman about Ms. Haws's doctor's suggestion and asked if Mr. Norman

would allow her to have a dog.  Further, Mr. Norman does not recall the conversation with Mr. Everton or his making an accommodation request on Ms. Haws's behalf.

Taking the facts in a light most favorable to Mr. Norman, a reasonable jury could conclude Ms. Haws did not put Mr. Norman on notice of her disability until April 2015.  A genuine issue of fact exists as to whether Mr. Norman knew of Ms. Haws's disability prior to April of 2015.  Mr. Norman does not dispute that he knew of Ms. Haws's disability in April 2015.

### 3.    Necessity of Accommodation

Ms. Haws asserts that her dog helps mitigate the effects of her disability. Specifically, Ms. Haws testified that taking care of a dog gives her a reason to get out of bed in the morning, eat, drink, go outside, and "gives [her] a reason to live."  (Haws Dep. 124: 9-21, Ex. E, ECF No. 19-1.)  Mr. Norman challenges Ms. Haws's assertion, claiming Ms. Haws's ability to live without a dog for most of her college years and do just fine and obtain alternative treatments that she turned down, shows the lack of necessity for the accommodation.  (Opp'n 38, ECF No. 21.)

To prove the necessity of an accommodation, Ms. Haws must show that "without an accommodation, [she] cannot take advantage of the opportunity (available to those without disabilities) to live in those housing facilities."  See Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City, 685 F.3d 917, 923 (10th Cir. 2012) (analyzing necessity prong of Fair Housing Act failure to accommodate claim).  The requested accommodation must expressly afford the person seeking it an "equal opportunity to use and enjoy a dwelling."  Id. (quoting 42 U.S.C. § 3604(f)(3)(B)).  Ms. Haws cites Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995) for the proposition that the Court

finds an accommodation necessary if it "ameliorat[es] the effects of the disability." (Mot. 19, ECF No. 19.) The Tenth Circuit explicitly rejected that analysis in Cinnamon Hills, 685 F.3d at 924.

Taking the facts in a light most favorable to Mr. Norman, a rational jury could find Ms. Haws did not need a dog to be able to live in the apartment. Therefore, the Court finds on the facts submitted a triable issue of fact exists as to whether Ms. Haws needed the requested accommodation.

### 4.    Reasonableness of Accommodation

In addition to establishing the necessity of the requested accommodation, Ms. Haws must also show that the requested accommodation was reasonable. DuBois, 453 F.3d at 1179; Arnal, 226 F. Supp. 3d at 1185-86. A reasonable accommodation "imposes no 'fundamental alteration in the nature of the program' or 'undue financial or administrative burdens.'" Giebeler v. M&B Assocs., 343 F.3d 1143, 1157 (quoting Howard v. City of Beavercreek, 276 F.3d 801, 806 (6th Cir. 2002)); see also Arnal, 226 F. Supp. 3d at 1185-86. "[W]hen a defendant possesses a legitimate nondiscriminatory reason for a housing decision, a plaintiff's requested accommodation must substantially negate the defendant's concern in order to be considered reasonable." Keys Youth Services, Inc. v. City of Olathe, 248 F. 3d 1267 (10th Cir. 2001). The reasonableness inquiry turns on the facts of the case. Anderson v. City of Blue Ash, 798 F.3d 338, 362 (6th Cir. 2015) (quoting Hollis v. Chestnut Bend Homeowners Ass'n, 760 F.3d 531, 541-42 (6th Cir. 2014) (overturning grant of summary judgment because of disputed issues of fact as to reasonability)).

Mr. Norman argues Ms. Haws's requested accommodation would "fundamentally alter the nature of Mr. Norman's housing facility because it would force roommates to also live with the animal within the intimate confines of the common living spaces of the apartment." (Opp'n 39, ECF No. 21.) As previously discussed, Ms. Haws shared a common living room, common kitchen, and common hallway with three roommates. (Opp'n 40, ECF No. 21.) Ms. Haws's roommates testified that Ms. Haws did not confine the dog to her room, and it urinated throughout the apartment several times, including in their rooms. (Payne Dep. 16:1-17:13, 19:1-20, Ex. 1, ECF No. 21-1; Arrowood Dep. 16:10-18:25, Ex. 2, ECF No. 21-1.) Mr. Norman raises a genuine dispute of fact regarding whether the accommodation was reasonable considering Ms. Haws lived with three roommates who each entered into separate no-pet lease agreements with Mr. Norman. Ms. Haws contests the effect of the accommodation on her roommates. The legitimacy and substantiality of the concern about the impact on these roommates remains an issue of fact for the jury to decide.

### 5. Denial of Accommodation Request

As previously discussed, when taking the facts in a light most favorable to Mr. Norman, Ms. Haws first put Mr. Norman on notice of her disability in April 2015. With that limitation, Ms. Haws must show any reasonable jury would conclude Mr. Norman denied Ms. Haws's April 2015 accommodation request. Mr. Norman denied Ms. Haws's request for accommodation by telling Ms. Haws she could not have the dog and never telling her any differently. (Norman Dep. 18:2-19:17, Ex. I, ECF No. 19-1.) However, Ms. Haws lived with the dog from the time she requested the accommodation to the day she moved out when her lease ended. (Haws Dep. 74:5-75:7, Ex. 5, ECF No. 21-1.)

In Dubois, the Ninth Circuit held that defendants did not refuse to make a requested accommodation when plaintiffs lived with an assistance dog from the day they brought the dog home to the day they vacated their unit. Dubois, 453 F.3d at 1179 ("The Condominium Association never required [the dog] to leave and thus never refused to make the requested accommodation."). In that case, the condominium association granted the plaintiffs a temporary exemption that lasted through its investigation. Id. The plaintiffs vacated the unit prior to the condominium association lifting their exemption. Id. at 1177 n.1, 1179.

Ms. Haws lived with her dog from the day she brought him home to the day she vacated her room when her lease ended. However, unlike Dubois, Mr. Norman specifically told Ms. Haws she could not have a dog and never suggested she could, even construing the facts in a light most favorable to Mr. Norman. On this point, Ms. Haws has proven that any reasonable jury would find Mr. Norman denied the April 2015 accommodation request.

Nonetheless, other material issues of fact remain in dispute regarding the failure to accommodate claim. Accordingly, the Court DENIES summary judgment on that claim.

## C.    Retaliation

Ms. Haws alleges Mr. Norman retaliated against her because she requested an accommodation. (Mot. 22-23, ECF No. 19.) Specifically, Ms. Haws alleges Mr. Norman retaliated against her by threatening to charge her a fee for having had the dog, by assessing a $1,050.00 pet fee on April 29, 2015, and by bringing a small claims action to collect the fee. (Id.) In addition, Ms. Haws claims Mr. Norman's call to her uncle and

subsequent visit to the apartment also reflect retaliatory actions.  (Id.)  Mr. Norman

counters that he could not have retaliated against Ms. Haws because she does not

qualify as disabled and because he did not act with the intent to discriminate on the

basis of disability.  (Opp'n 40-41, ECF No. 21.)

### 1.   Which Test to Apply

Section 3617 of the Federal Fair Housing Act states that "[i]t shall be unlawful to

coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of,

or on account of his having exercised or enjoyed . . . any right granted or protected" by

the Federal Fair Housing Act.  42 U.S.C. § 3617; see accord, Utah Code Ann. § 57-21-7

(including similar language along with the prohibition on reprisals against a person for

opposing a practice prohibited by the chapter).

Neither the Tenth Circuit nor the Utah Supreme Court has addressed this type of

retaliation claim previously.  Ms. Haws argues for the application of the standard

retaliation test applicable to all civil rights violations.  (Mot. 10, ECF No. 19; Reply 34-

45, ECF No. 22.)  Mr. Norman urges application of the Seventh Circuit's test, arguing it

"represent[s] a more accurate test because it was adopted specifically for retaliation

claims and the elements were taken directly from the statutory language of the FHA."

(Opp'n 15, ECF No. 21.)

Ms. Haws contends she need only prove the following:  (1) she engaged in a

protected activity; (2) she suffered an adverse action in the form of coercion,

intimidation, threats, or interference; and (3) a causal link connects the two.  See Walker

v. City of Lakewood, 272 F.3d 1114, 1128 (9th Cir. 2001) (applying McDonnell Douglas

burden-shifting analysis in the absence of direct evidence).  Mr. Norman may rebut Ms.

Haws's prima facie claim of retaliation by articulating a legitimate, nondiscriminatory reason for his actions.  Id.

Mr. Norman contends Ms. Haws must prove:  (1) she is a protected individual under the Fair Housing Acts, (2) she engaged in the exercise or enjoyment of her fair housing rights, (3) Mr. Norman coerced, threatened, intimidated, or interfered with Ms. Haws because she engaged in a protected activity under the Fair Housing Acts, and (4) Mr. Norman possessed the intent to discriminate.  Bloch v. Frischholz, 587 F.3d 771, 783 (7th Cir. 2009).

As noted above, ADA claims for accommodation and Fair Housing Acts claims for disability accommodation share policy goals and similar statutory language. Therefore, Tenth Circuit case law on these closely related claims provides the best indicator of how the Tenth Circuit will interpret retaliation in the fair housing realm where a person has made a request for disability accommodation. The Tenth Circuit requires an ADA plaintiff to have a reasonable, good-faith belief that she qualifies as disabled. Foster v. Mountain Coal Co., 830 F.3d 1178, 1186 (10th Cir. 2016) (quoting Selenke v. Med. Imaging, 248 F.3d 1249, 1246 (10th Cir. 2001)).  Further, a plaintiff must prove a request for an accommodation on her behalf; "[an] adverse employment action subsequent to or contemporaneous with the protected activity"; and "a causal connection between the protected activity and the adverse employment action."  Foster, 830 F.3d at 1186-87 (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999)).

Ms. Haws's proposal omits the first element of the claim, Mr. Norman's proposal sets too high a bar.  The Tenth Circuit has held that unlike an ADA discrimination claim,

a plaintiff need not show she "suffers from an actual disability" to prevail on an ADA

retaliation claim. Foster, 830 F.3d at 1186 (quoting Selenke, 248 F.3d at 1246). A

"plaintiff need only show that he had a reasonable, good-faith belief that he was

disabled." Id.; see also Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir.

2010). The Tenth Circuit recognized that 42 U.S.C. § 12203(a) "protects 'any

individual' who has opposed any act or practice made unlawful by the ADA." Foster,

830 F.3d at 1186 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 502 (3d Cir.

1997) (quoting 42 U.S.C. § 12203(a))).

        Similarly, the Federal Fair Housing Act protects "any person" who tries to

exercise her rights to fair housing or who "aided or encouraged any other person" to

exercise her rights to fair housing. 42 U.S.C. § 3617; see also Utah Code Ann. § 57-21-

7(1)(a)(ii) (prohibiting coercion, intimidation, threats, or interference with "a person . . .

because that person exercised a right granted or protected under this chapter; or . . .

because that person aided or encouraged any other person in the exercise or

enjoyment of a right granted or protected under this chapter"). Thus, the Fair Housing

Acts explicitly extend beyond just those individuals who qualify as disabled. The

different coverage for retaliation makes sense because protecting only those who can

prove "a physical or mental impairment which substantially limits one or more of such

person's major life activities" could discourage people who have an impairment from

seeking accommodation for fear their impairment would not be considered significant

enough, and the risk of retaliation would loom too large.

        The parties agree on the next two elements needed to prove Fair Housing Acts

retaliation claims, namely a request for accommodation and adverse action in the form

of coercion, intimidation, threats, or interference subsequent to or contemporaneous with the protected activity. The specification of "coercion, intimidation, threats, or interference" incorporates the language of 42 U.S.C. § 3617, which states "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised" her rights under the Fair Housing Acts. See also Utah Code Ann. § 57-21-7. The parties also agree a causal connection must connect the request for accommodation and the coercion, intimidation, threats, or interference.

Mr. Norman advocates for a further element to the test that would require a plaintiff to show the defendant intended to discriminate based on the plaintiff's disability when he took the adverse action. The Court finds the requirement of a causal connection between the request for accommodation and the purported prohibited retaliation adequately addresses intent. The "'causal connection,' element requires an analysis of the defendant's intent; that is, of whether the defendant acted the way he did as a response to the plaintiff's protected activity or for some other reason." Robert G. Schwemm, Housing Discrimination Law & Litig., § 20:5 (collecting cases supporting this analysis). The Tenth Circuit analyzes causation in ADA employment cases in terms of showing the defendant took the adverse action with the motive of retaliating for the protected activity. See Foster, 830 F.3d at 1192-93 (analyzing employer's action to determine whether termination occurred in retaliation for requested accommodation or for other purposes); see accord, Burrus v. United Tel. Co., 683 F.2d 339, 343 (10th Cir. 1982) (stating in the retaliation for alleging sex discrimination context: "The causal

connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive.")

Requiring the plaintiff to show an intent to discriminate based on disability would narrow the scope of the statute considerably with no basis in the statutory language. Other portions of the Fair Housing Acts address discrimination based on disability.  42 U.S.C. §§ 3604, 3605, 3607; Utah Code Ann. §§ 57-21-5, 57-21-6.  Many courts have held that one need not prove discrimination under these other sections to prevail under § 3617.  Revock v. Cowpet Bay West Condo. Assoc., 853 F.3d 96, 112 (3d Cir. 2017); Bloch v. Frischholz, 587 F.3d 771, 781-82 (7th Cir. 2009); Arnal, 226 F. Supp. 3d at 1188; Zhu v. Countrywide Realty, Co., 165 F. Supp. 2d 1181, 1196 (D. Kan. 2001); Robert G. Schwemm, Housing Discrimination Law & Litig., § 20:5 ("a § 3617 retaliation claim is independent of the plaintiff's underlying §§ 3604 to 3606 claim").  Section 3617, by contrast to the discrimination sections, protects those engaged in protecting rights under the Fair Housing Acts from adverse action.  A landlord could well wish to retaliate for such advocacy for reasons other than discrimination, such as for the expense the advocacy caused or to discourage others from similarly advocating for their perceived rights in the future because the advocacy is bothersome. These motives do not reflect an intent to discriminate based on disability but do violate the Fair Housing Acts if acted upon.  See accord, Burlington N. & Santa Fe R. Co. v. White, 548 U.S. 53, 57 (2006) (holding retaliatory actions include any action that "could well dissuade a reasonable [plaintiff] from making or supporting a charge of discrimination" in the employment discrimination context).

In considering both proposed tests and Tenth Circuit case law regarding ADA retaliation claims in determining what standard governs a Fair Housing Acts retaliation claim based on a request for accommodation, the Court places the most weight on the Tenth Circuit's ADA precedent, draws on the Fair Housing Act's language, and finds the following constitute the elements of a retaliation claim:

1) The plaintiff had a reasonable, good-faith belief that she or the person on whose behalf the plaintiff advocated qualifies as disabled.

2) The plaintiff requested an accommodation.

3) The landlord coerced, intimidated, threatened, or interfered with the plaintiff in the exercise or enjoyment of her rights under the Fair Housing Acts, or on account of her having exercised her rights under the Fair Housing Acts subsequent to or contemporaneous with the request for accommodation.

4) And a causal connection links the protected activity and the coercion, intimidation, threats, or interference.

The Court imports the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973), burden-shifting analysis because Ms. Haws seeks to prove retaliation through circumstantial rather than direct evidence, (Mot. 13-14, ECF No. 19). Looking again to Tenth Circuit precedent in the ADA retaliation for an accommodation request context the court explained:

> Under this framework, once the plaintiff establishes a prima facie case of retaliation, "the employer has the burden of showing it had a legitimate nondiscriminatory reason for the adverse action. If the employer can do so, the burden [of production] shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief."

Foster, 830 F.3d at 1186 (quoting EEOC v. Picture People Inc., 684 F.3d 981, 988 (10th Cir. 2012)) (alteration in original).  Therefore, if Ms. Haws, the tenant, puts forth prima facie evidence of retaliation, the burden shifts to Mr. Norman, the landlord, to show he had a legitimate nondiscriminatory reason for the coercion, intimidation, threats, or interference.  If Mr. Norman meets his burden, Ms. Haws then bears the burden to prove the proffered nondiscriminatory reason lacks veracity.

## 2. **Application to this Case**

As to the first element of a retaliation claim, Ms. Haws has shown a good faith belief that she qualifies as disabled.  Ms. Haws sought medical assistance and a medical opinion in seeking accommodation.  Mr. Norman does not dispute that Ms. Haws has major depression or posttraumatic stress disorder.  Mr. Norman simply disputes the effect these disorders have on Ms. Haws's life.  He does not contend the opinion letter from the doctor is fake or that Ms. Haws obtained it under false pretenses. Under these facts, Ms. Haws meets her obligation to make a prima facie showing that she held a good faith belief she qualified as disabled under the Acts.

As to the second element, both parties agree, Ms. Haws attempted to exercise what she perceived as her fair housing rights by requesting an accommodation.

Regarding the third element, adverse action, Mr. Norman informed Ms. Haws he would charge her $50.00 for each day she kept her dog in the apartment prior to the day she made her accommodation request.  (Opp'n 17, ECF No. 21.)  Mr. Norman admits that on April 29, 2015 he billed Ms. Haws for $1,050.00.  (Id.)  Mr. Norman admits that he called Ms. Haws's uncle and asked him to help resolve the dispute over the dog.  (Id. at 18.)  And Mr. Norman admits that on May 15, 2015 he brought a small claims action

against Ms. Haws. (Id.) Under the Fair Housing Acts, adverse action includes coercion, intimidation, threats, and interference. 42 U.S.C. § 3617; Utah Code Ann. § 57-21-7. On these facts, Ms. Haws has made her prima facie showing that the threat of fees, the assessment of fees, and the filing of a small claims action to collect the fees constitute adverse action.

Reaching the fourth element of a retaliation claim, causation, Ms. Haws must put forth prima facie evidence that Mr. Norman took these actions with the motive of punishing her for having requested an accommodation. Mr. Norman threatened charging fees for having the dog, billed Ms. Haws for those fees, and then filed a collection action for those fees. Mr. Norman took all of these actions within less than one month of the undisputed request for accommodation. All of these actions specifically related to the accommodation requested—the presence of the dog at the apartment. Under these facts, Ms. Haws has put forth prima facie evidence of retaliation.

At this point in the McDonnell-Douglas analysis the burden shifts to Mr. Norman to put forth evidence of a legitimate, nondiscriminatory reason for his actions. Mr. Norman puts forth evidence showing he charged Ms. Haws a pet fee for the days she lived with the dog before making an accommodation request, not for the time after the request. Mr. Norman testified that he felt compelled to enforce the lease to prevent future tenants from thinking he would tolerate lease violations. (Norman Dep. 21:4-18, Ex. F, ECF No.19-1.) Neither party suggests Mr. Norman started eviction proceedings or refused to renew Ms. Haws's lease. Ms. Haws lived with her dog at the apartment for the remainder of the lease following her request for accommodation. Mr. Norman has

presented evidence showing he intended to enforce the terms of the lease and did not intend to prevent further requests for accommodation.

Having met his burden of production, the burden shifts back to Ms. Haws to prove that this reason constitutes mere pretext, disguising Mr. Norman's retaliatory motive. The Court finds a reasonable jury could find that Mr. Norman's actions do not reflect mere pretext. Thus a material dispute of fact precludes summary judgment in Ms. Haws's favor on her retaliation claim. Accordingly, the Court DENIES summary judgment on Ms. Haws's retaliation claim.

## IV. CONCLUSION

For the reasons stated above, the Court DENIES summary judgment on Ms. Haws's failure to accommodate and retaliation claims.

DATED this 20th day of September 2017.

BY THE COURT:

EVELYN J. FURSE
United States Magistrate Judge